# United States Navy–Marine Corps Court of Criminal Appeals

Before
HOLIFIELD, GARRISON, and HACKEL
Appellate Military Judges

———————————————

**UNITED STATES**
*Appellee*

**v.**

**Yusef R. ALI**
Electronics Technician, Submarine, Navigation First Class
(E-6), U.S. Navy
*Appellant*

**No. 202100261**

———————————————

Decided: 21 July 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Kimberly J. Kelly (arraignment)
Ann K. Minami (trial)

Sentence adjudged 28 June 2021 by a general court-martial convened at Naval Base Kitsap, Washington, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to E-1, confinement for 48 months, and a dishonorable discharge.

For Appellant:
*Captain Thomas P. Belsky, JAGC, USN*

For Appellee:
*Lieutenant Commander Jeffrey S. Marden, JAGC, USN*
*Lieutenant Gregory A. Rustico, JAGC, USN*

Judge HACKEL delivered the opinion of the Court, in which Senior Judge HOLIFIELD and Judge GARRISON joined.

————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

————————————

HACKEL, Judge:

Appellant was convicted, pursuant to his pleas, of one specification of indecent visual recording of the private area of individuals aboard *USS Alabama* (SSBN 731), and three specifications of possession of child pornography, in violation of Articles 120c and 134, Uniform Code of Military Justice [UCMJ].[1]

Appellant asserts two assignments of error [AOE]: one, that Appellant's trial defense counsel [TDC] were ineffective for failing to adequately explain Appellant's options regarding sentencing procedures and for advising Appellant to elect sentencing procedures in accordance with rules implemented pursuant to the Military Justice Act of 2016 (MJA 16); and two, that Appellant's sentence was greater than necessary to achieve the goals of sentencing in the military justice system. We find no prejudicial error and affirm.

## I. BACKGROUND

In January 2020, the Federal Bureau of Investigation coordinated with the Naval Criminal Investigative Service (NCIS) as part of an investigation of a civilian college student who was suspected of advertising, selling, and distributing child pornography. The investigation identified Appellant as having purchased child pornography over the internet from the civilian in 2018. In multiple transactions, he paid at least $425 for digital images and videos displaying sexually explicit conduct of children under the age of 18, generally boys under 12. Appellant saved these images to multiple personal computing devices. In April 2020, NCIS agents seized several of Appellant's digital devices, where they found over 2900 image and video files depicting child pornography

---

[1] 10 U.S.C. §§ 920c, 934.

corresponding to over 350 known series names.[2] The Government preferred charges in July 2020 for multiple specifications of violating Article 134, UCMJ, for possession of child pornography on or about 15 April 2020, the date NCIS seized Appellant's digital devices.

Appellant hired a civilian defense attorney to negotiate a plea agreement.[3] Notably, the plea negotiations were made in the context of a "plea agreement," not a "pretrial agreement," because the charged offenses took place on or after 1 January 2019, and thus the MJA 16 procedural rules applied for the purpose of the plea negotiations.[4]

After the initial plea negotiations failed, Appellant changed his defense team. In October 2020, "[d]uring the course of the failed negotiation, Appellant lost faith and trust in his initially hired civilian attorney to effectively negotiate a plea agreement,"[5] replacing him with Mr. Papa, the civilian defense counsel [CDC] who represented Appellant through the subject court-martial.[6] Around the same time, the Government discovered additional evidence of a separate offense on Appellant's seized computers.

The new evidence revealed that over the course of more than four months in 2016, while on patrol aboard *USS Alabama* (SSBN 731), Appellant surreptitiously made over 60 video recordings of fellow male Sailors exiting the shower in the forward head of the boat. The videos showed at least 13 Sailors in a state of undress with exposed genitalia. None of the Sailors consented to being video recorded in this location, where they had an expectation of privacy. Appellant saved these recordings to his personal laptop computers, where they were discovered by the Department of Defense Cyber Crime Center as part of the analysis of the child pornography found on Appellant's computers.

With this new evidence in hand, the Government started over. The original child pornography charges were withdrawn in October 2020 and new charges

---

[2] Pros. Ex. 10. A "series name" means that the National Center for Missing and Exploited Children identified a particular victim that was investigated and verified by law enforcement. Each "series name" corresponds to at least one specific victim. R. 90.

[3] Aff. of CDC, at 2.

[4] Compare, Rule for Courts-Martial [R.C.M.] 705, *Manual For Courts-Martial, United States* (2019 ed.) [*MCM* (2019)], "Plea agreements," with R.C.M. 705, *Manual For Courts-Martial, United States* (2016 ed.) [*MCM* (2016)] "Pretrial agreements."

[5] Aff. of CDC, at 2.

[6] All names in this opinion, other than those of Appellant, the judges, and appellate counsel, are pseudonyms.

were preferred three months later, including one specification under Article 120c (indecent recording) and five specifications under Article 134 (possession of child pornography). With one charge alleging an offense in 2016, and another charge alleging offenses in 2020, the procedural posture of Appellant's case changed, in that he now faced "straddling offenses," or offenses taking place both before and after the implementation of MJA 16. Appellant now faced a decision about which sentencing procedures to elect.

Appellant's election of sentencing procedures was one of the first matters addressed on the record by the military judge. At the first Article 39(a) session of the court-martial, immediately prior to arraigning Appellant, the military judge explained that the sentencing rules in effect prior to 1 January 2019 would be in effect for his court-martial, but that he could elect to be sentenced under the sentencing rules in effect as of 1 January 2019.[7] She then established that Appellant had discussed this election with his defense counsel. After confirming to the military judge that his TDC had fully explained this choice and that he had no questions about his rights, Appellant elected the MJA 16 sentencing procedures.

On appeal, Appellant claims ignorance of the consequences of the MJA 16 sentencing procedures election and alleges that he received ineffective assistance from his counsel related to this election. In his first affidavit, Appellant states, "At my arraignment, my trial defense counsel, without explanation, advised me to elect to be sentenced under the rules put in place pursuant to the Military Justice Act of 2016. They did not explain to me the consequences of electing this option."[8] Appellant asserts that, had he understood how making this election would limit the military judge's discretion at sentencing, and in light of his overriding concerns of how his sentence would affect his family and eligibility for retirement, he would have chosen the pre-MJA 16 sentencing procedures.[9]

---

[7] 10 U.S.C. § 939(a).

[8] Aff. of Appellant (dated 16 December 2021) [Aff. 1], at 2.

[9] Aff. 1 of Appellant, at 1-3. We note that Appellant's CDC was absent during the arraignment, his presence waived by Appellant. Nonetheless, we recognize that Appellant's claims about his TDC's advice and performance applies to both his military and civilian counsel.

In response to this Court's order, both Appellant's TDC and CDC provided affidavits on this subject.[10] Lieutenant (O-3) [LT] Delta was detailed to serve as Appellant's counsel in July 2020 shortly after the initial child pornography charges were preferred, and she continued to represent Appellant throughout the trial and post-trial matters. LT Delta writes that she and Appellant spoke in person and over the phone on numerous occasions about the ongoing plea negotiations. Prior to his arraignment, she showed him a copy of the arraignment script and discussed the steps of the hearing. She explains in her affidavit, "At those in person meetings, [she and Appellant] specifically discussed whether to elect pre- or post-MJA 16 sentencing."[11] LT Delta further explains that Appellant had submitted a proposed plea offer to the Convening Authority the week before his arraignment, but that it was still pending at the time of his arraignment. Because Appellant's pending plea agreement included a minimum sentence provision, LT Delta states that "it was a deliberate and strategic choice to elect post MJA 16 sentencing rules" and "[Appellant] did not want to void the plea agreement."[12] Describing the advice she provided Appellant regarding this election, LT Delta explains, "If he had elected the old rules, the submitted plea offer would have been void as a legal impossibility and we risked the plea negotiations failing. This was discussed with [Appellant] in depth and I believed he understood, going into the arraignment, the choices he had and the consequences of those choices."[13]

Mr. Papa's affidavit states he was retained by Appellant with the intent that he negotiate a plea agreement, which Appellant's previous civilian defense counsel had failed to accomplish.[14] He writes that at all times during the plea negotiations, "[t]he Government was entirely unwilling to take a punitive discharge off the table in a plea agreement. [The defense's] focus shifted to reducing confinement. Appellant understood and agreed with this approach."[15] Additionally, the Government was unwilling to remove a mandatory minimum sentence from the plea agreement, and thus the defense "needed to keep a

---

[10] We take Appellant's reference of "trial defense counsel" to mean both his military trial defense counsel and his civilian defense counsel.

[11] Aff. of TDC, at 2.

[12] *Id.*

[13] *Id.*

[14] Aff. of CDC, at 2.

[15] *Id.*

mandatory minimum for negotiation purposes and to keep the maximum sentence as low as possible."[16]

Appellant's TDC approached plea negotiations believing that avoiding a punitive discharge after pleading guilty to possession of child pornography would be "nearly impossible."[17] With the goal of minimizing Appellant's exposure to a lengthy term of confinement, TDC and CDC advised Appellant to accept MJA 16 sentencing rules because they believed "Appellant needed and benefitted from the ability to negotiate a mandatory minimum sentence. Had he elected pre-MJA 16 rules, his pending plea agreement would have been lost….and he likely would have had to accept a higher possible maximum sentence."[18] Negotiations continued until one week after Appellant's arraignment when both sides settled on 55 months as the maximum term of confinement.

In his second affidavit, submitted in reply to TDC and CDC's affidavits, Appellant insists that his attorneys did not explain the differences in the sentencing rules prior to his arraignment, and thus his election was poorly informed. Though he followed his TDC's advice in electing MJA 16 sentencing rules when asked by the military judge, he claims to have been ignorant about the broader context of this decision. In hindsight, Appellant claims to understand that under pre-MJA 16 rules, the convening authority would not have been able to set minimum punishments in the terms the PTA. Appellant also states that the military judge would have been unaware of a PTA's sentence limitation terms, and thus uninfluenced by them. Appellant claims that, had he fully understood these terms, he would have elected pre-MJA 16 sentencing procedures, even if it meant negotiating for a greater term of confinement, to have the ability to argue against a mandatory punitive discharge and for no confinement. Appellant believes his TDC instructed him to elect MJA 16 rules because the Government would only agree to a lower maximum term if the plea agreement included a mandatory minimum sentence. Finally, Appellant claims not to have understood that he could elect the pre-MJA 16 sentencing rules for his plea negotiations, or that the Government could not force him to accept a plea agreement under the MJA 16 rules. He claims that, had he known these matters, he would not have agreed to a plea agreement even if it meant a higher possible sentence.

---

[16] *Id.* at 3.

[17] *Id.*

[18] *Id.* at 4.

The plea agreement provided that a dishonorable discharge would be adjudged; no forfeitures or fines would be adjudged; any reduction could be adjudged; confinement could be no less than 60 days and no more than 55 months for each specification, to be served concurrently with all other specifications; and other lawful punishments could be adjudged.[19] The military judge sentenced Appellant to be reduced to E-1, to be discharged with a dishonorable discharge, to be confined for 36 months for the sole specification of Charge I, and to be confined for 48 months for each of the specifications of Charge II, with all confinement to be served concurrently, for a total of 48 months.

## II. DISCUSSION

### A. Appellant's Claim of Ineffective Assistance of Counsel Lacks Merit

#### 1. Standard of Review and the Law

We review claims of ineffective assistance of counsel de novo.[20] To prevail on such a claim, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."[21] The appellant bears the "burden of establishing the truth of factual matters relevant to the claim."[22] Only after an appellant has met his burden and has demonstrated both deficiency and prejudice can we find in the appellant's favor on an ineffective assistance of counsel claim.[23] Furthermore, "it is not necessary to decide the issue of deficient performance when it is apparent that the alleged deficiency has not caused prejudice.[24]

#### 2. Appellant Fails to Demonstrate Prejudice

When conducting an analysis of an ineffective assistance of counsel claim in the context of a guilty plea, we focus on whether the ineffective performance

---

[19] App. Ex. III, at 7-8.

[20] *United States v. Cooper*, 80 M.J. 664, 672 (N-M. Ct. Crim. App. 2020).

[21] *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)) (other citation omitted).

[22] *Denedo v. United States*, 66 M.J. 114, 128 (C.A.A.F. 2008).

[23] *Cooper*, 80 M.J. at 672.

[24] *United States v. Bradley*, 71 M.J. 13, 16 (C.A.A.F. 2012). *See also, Strickland*, 466 U.S. at 697. ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

affected the outcome of the plea process. "To satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[25] Furthermore, the prejudice inquiry "is modified to focus on whether the 'ineffective performance affected the outcome of the plea process.'"[26] "A reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a substantial, not just conceivable, likelihood of a different result."[27] In such cases, when there is an allegation that counsel was ineffective in the sentencing phase of the court-martial, the court must consider "whether there is a reasonable probability that, but for counsel's error, there would have been a different result."[28]

There is nothing in the record to indicate that but for his counsels' alleged error, Appellant would not have pleaded guilty and would have insisted on going to trial. At most, Appellant claims that had he been better informed about the MJA 16 sentencing procedures election, he would not have agreed to an MJA 16 plea agreement even if it would have meant settling for a PTA with a higher possible sentence limitation. He asserts that the outcome would have been different had he elected pre-MJA 16 sentencing procedures because he could have fared better in sentencing. He focuses on an accused's ability to "beat the deal" in the context of a pre-MJA 16 PTA, whereby an accused would receive the benefit of the lower of either the negotiated punishment terms in the PTA, or the military judge's adjudged sentence. Appellant claims to have suffered prejudice because the MJA 16 sentencing procedures provide for more rigidly-defined negotiated sentences in which the military judge must adjudge a sentence within the negotiated range, thereby precluding an accused from "beating the deal." Yet Appellant offers only speculation to demonstrate that pre-MJA 16 PTAs produce results more favorable to an accused than MJA 16 plea agreements, either generally or specifically in this case. In other words, he asks this Court to rely upon a merely conceivable, but not substantial, likelihood of a different result.

---

[25] *Bradley*, 71 M.J. at 16 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

[26] *Id.*

[27] *Id.* (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (internal punctuation omitted).

[28] *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (quoting *United States v. Quick*, 59 M.J. 383, 386-87 (C.A.A.F. 2004)).

Appellant's insistence that pre-MJA 16 sentencing procedures would have been better for him than MJA 16 sentencing procedures bears no fruit. As made clear by the affidavits of CDC and TDC, had Appellant negotiated a PTA under pre-MJA 16 rules, the terms likely would have been similar, only with a sentence limitation higher than 55 months.[29] While the sentence limitation portion of a PTA would not have required the court-martial to adjudge a dishonorable discharge, the convening authority would not have offered any protection from a punitive discharge, and thus Appellant would still have faced a punitive discharge and a multi-year term of confinement—both likely punishments given the nature and extent of Appellant's misconduct.[30] As such, we find nothing in the record to support Appellant's claim that pre-MJA sentencing procedures would have led to better results for Appellant with respect to the terms of a PTA.

Next, looking at the adjudged sentence, we find Appellant has failed to meet his burden to show there is a reasonable probability that, but for counsel's alleged errors, there would have been a different result. With respect to the dishonorable discharge, as this Court has seen time and again, it is not uncommon for an accused found guilty of possession of child pornography to receive an adjudged sentence of a punitive discharge—frequently a dishonorable discharge—and a term of confinement measured in years, regardless of mitigating evidence.[31] With respect to the term of confinement, with a range of 60 days to 55 months available in this case, the military judge sentenced Appellant significantly towards the higher end of that range, adjudging a 48-month sentence. Further, although the plea agreement required the military judge to adjudge a dishonorable discharge, she made no recommendation to the convening authority to suspend any portion of Appellant's sentence, including the punitive discharge. As such, we infer that the military judge deemed a dishonorable discharge to be appropriate in this case despite Appellant's case in extenuation and mitigation.

---

[29] Aff. of CDC, at 4.

[30] *Id.* at 2. *See also,* Aff. of TDC, at 2.

[31] We recognize that every case is unique and requires a particularized sentencing analysis. "We may consider other court-martial sentences when determining sentence appropriateness; however, we are only required 'to engage in sentence comparison with *specific cases . . .* in those rare instances in which sentence appropriateness can be fairly determined *only* by reference to disparate sentences adjudged in closely related cases.'" *United States v. Bocage*, No. 202000206, 2022 CCA LEXIS 311 at *5 (N-M. Ct. Crim. App. May 25, 2022) (unpublished) (quoting *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001))(emphasis in original).

Appellant further hints that, by knowing the sentence limitation portion of the plea agreement prior to adjudging Appellant's sentence, the military judge was swayed by those terms. We are unmoved by this argument considering the wide range available to the military judge in crafting a sentence. Having heard all the relevant evidence, she adjudged a sentence approaching 90 percent of the upper end of the permitted sentencing range. Moreover, as discussed, she made no recommendation that the convening authority suspend any portions of the adjudged sentence. We consider the absence of such a recommendation compelling in view of Appellant's robust case in mitigation, in which he presented considerable evidence of his lengthy career, otherwise good character, remorse, and rehabilitative potential.

Appellant claims his counsels' advice to elect MJA 16 sentencing rules "was based on an impermissible *sub rosa* condition his counsel and the trial counsel agreed to as part of the plea agreement," and, therefore, Appellant's pleas were not provident.[32] We disagree. As emphasized by both of Appellant's attorneys, the convening authority insisted on a mandatory minimum term of confinement during plea negotiations; electing MJA 16 procedures was necessary to accomplish this condition. Election of MJA 16 procedures was not a *sub rosa* condition, but rather the framework through which Appellant was required to work to accomplish his objective of securing a plea deal.

Given the convening authority's negotiating position, Appellant could have offered a pre-MJA 16 PTA with a higher term of potential confinement. Otherwise, as Appellant's CDC pointed out, "[t]he only option Appellant had to eliminate the mandatory term of confinement and to concurrently preserve the option of no punitive discharge, was to plead guilty without any plea agreement (commonly called pleading 'naked'). This would have unnecessarily exposed Appellant to the maximum sentence and would have required him to plead to all charges, or do a mixed plea."[33] The option Appellant ultimately chose—an MJA 16 plea agreement with minimum and maximum sentencing terms—required him to elect MJA 16 sentencing procedures. Appellant simply confuses the mechanics of the Congressionally-prescribed plea agreement process with an impermissible *sub rosa* agreement.

---

[32] Appellant Reply Brief, at 8. Appellant also offered this claim in the form of two AOEs in a Supplemental Brief. His motion for leave to file this brief was denied because he had already effectively raised the issue in his Reply Brief.

[33] Aff. of CDC, at 4.

Finally, in focusing narrowly on his own desires in the plea negotiations, Appellant overlooks that there was another party involved in the negotiations—the convening authority. On the one hand, Appellant's main concerns were to minimize confinement and to preserve his retirement eligibility. On the other hand, the convening authority desired a minimal term of confinement and no protection from a punitive discharge.[34] Hired with the primary goal of successfully negotiating a plea agreement, and reminded that the former CDC had been fired for his inability to secure one, Appellant's CDC sought the most favorable terms in the back-and-forth negotiations with the convening authority. Recognizing the futility of attempting to convince the convening authority to protect Appellant from a punitive discharge, CDC leveraged the dishonorable discharge term to reduce Appellant's exposure to confinement. Negotiating the confinement cap became a key issue for the parties. Appellant's initial proposed plea agreement offered 60 days of confinement with a confinement cap of 48 months, while the convening authority proposed a cap of 72 months.[35] Ultimately the parties settled on 55 months. Seen in the light of the previous failed plea negotiations, the ultimately successful multi-week plea negotiations, and the convening authority's own goals, we are convinced that Appellant's TDC discussed the MJA 16 sentencing procedural framework with him, despite his statements to the contrary.[36]

After careful consideration of the record, we find that Appellant has failed to demonstrate a substantial, not just conceivable, probability that, but for counsels' alleged error, there would have been a different result. As such, we find that Appellant has not demonstrated prejudice as a result of his counsels' allegedly erroneous advice to elect MJA 16 sentencing procedures. Accordingly, we find that the plea agreement is valid, that both Appellant and the convening authority have satisfied the material terms of the plea agreement, that Appellant's pleas are provident, and that the findings are correct in law and fact.

---

[34] Aff. of CDC, at 2.

[35] Aff. of CDC, at 3.

[36] *See United States v. Ginn*, 47 M.j. 236, 248 (C.A.A.F. 1997) (stating that if "the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of [the] facts [asserted by Appellant], the Court may discount those factual assertions and decide the legal issue" without remanding for additional fact-finding). Appellant submitted a plea agreement on or about 27 April 2021. After subsequent negotiations, the convening authority signed the plea agreement on 13 May 2021. Aff. of CDC, at 3.

**B. Appellant's Sentence Was Appropriate**

Appellant asserts his sentence was greater than necessary to achieve the goals of sentencing in the military justice system. We review sentence appropriateness de novo.[37] This Court may only affirm "the sentence, or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved."[38] In exercising this function, we seek to assure that "justice is done and that the accused gets the punishment he deserves."[39] The review requires an "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender."[40] We have significant discretion in determining sentence appropriateness, but may not engage in acts of clemency.[41]

A court-martial may adjudge any punishment authorized, except "[i]f the military judge accepts a plea agreement with a sentence limitation, the court-martial shall sentence the accused with the limits established by the plea agreement."[42] Additionally, "The punishment which a court-martial may direct for an offense may not exceed such limits as the President may prescribe for that offense."[43] Given the terms of Appellant's plea agreement and the sentence adjudged, we find that the adjudged sentence did not exceed the maximum allowable sentence under the UCMJ, nor did it exceed the terms of the plea agreement.

Appellant alleges that the adjudged confinement violates Article 56, UCMJ, for two reasons: first, because of Appellant's remorse and steps towards rehabilitation, nothing above the minimal sentence of 60 days of confinement would be appropriate; and second, since Appellant's dishonorable discharge is a particularly severe punishment because of Appellant's lost potential retirement eligibility, confinement over 60 days is an excessive punishment.

---

[37] *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006).

[38] Article 66(d)(1), UCMJ.

[39] *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).

[40] *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (citation and internal quotation marks omitted).

[41] *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

[42] Rule for Court-Martial [R.C.M.] 1002(a)(2).

[43] Art. 56(a), UCMJ.

In determining a sentence, "the court-martial shall impose punishment that is sufficient, but not greater than necessary, to promote justice and to maintain good order and discipline in the armed forces."[44] The court must consider such factors as the nature and circumstances of the offenses, the history and characteristics of the accused, impacts on the victims, and impacts on the command.[45] Additionally, the sentence must reflect the seriousness of the offense, promote respect for the law, provide for just punishment, promote adequate deterrence, protect others from future crimes of the accused, and rehabilitate the accused.[46]

Appellant's offenses were serious and had lasting impacts on the victims. He admitted to having secretly recorded his undressed fellow shipmates over a period of months while they were living in the very close confines of a deployed submarine. Appellant unlawfully made videos capturing at least 40 Sailors—13 of whom were identified by NCIS—which he filed away for personal viewing and maintained for nearly four years until their discovery by law enforcement. Multiple victims testified about the impacts of Appellant's offenses, describing persistent physical reactions when considering the crime, loss of trust, and feeling "disgusted."[47] Additionally, Appellant admitted to having purchased thousands of images and videos of children engaged in sexual acts, in which over 350 victims were identified by the National Center for Missing and Exploited Children. Appellant sought out and paid for these images and videos, and then kept them for years on multiple electronic devices until they were seized by law enforcement. In mitigation, Appellant presented evidence of his long naval career, acceptance of responsibility, expressions of remorse, and efforts at rehabilitation. Nonetheless, we find the sentence adjudged by the military judge to be in accord with the requirements of Article 56, UCMJ, and R.C.M. 1002. Appellant's offenses merit the adjudged punishment.

Finally, as discussed, "Appellant's punishment was the predictable result of a [plea agreement] that he negotiated and voluntarily entered into with the convening authority."[48] Appellant voluntarily chose to plead guilty in accordance with the specific terms of an agreement he freely negotiated. As we have

---

[44] R.C.M. 1002(f).

[45] R.C.M. 1002(f)(1) and (2).

[46] R.C.M. 1002(f)(3).

[47] R. at 102, 110, 111, 115.

[48] *Bocage*, 2022 CCA Lexis 311 at *7.

previously stated, "we generally refrain from second guessing or comparing a sentence that flows from a lawful pretrial agreement."[49]

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[50]

The findings and sentence are **AFFIRMED**.

Senior Judge HOLIFIELD and Judge GARRISON concur.

FOR THE COURT:

S. TAYLOR JOHNSTON
Interim Clerk of Court

---

[49] *United States v. Widak*, No. 201500309, 2016 CCA LEXIS 172, *7 (N-M. Ct. Crim. App. Mar. 22, 2016) (unpublished).

[50] Articles 59 & 66, UCMJ.